ANGELICA MORRIS                                    CIVIL ACTION

VERSUS                                             NO. 08-4105

MICHAEL J. ASTRUE, COMMISSIONER                   SECTION "S" (2)
OF SOCIAL SECURITY ADMINISTRATION


## FINDINGS AND RECOMMENDATION

Plaintiff, Angelica Morris, seeks judicial review pursuant to Section 405(g) of the Social Security Act (the "Act") of the final decision of the Commissioner of the Social Security Administration (the "Commissioner"), denying plaintiff's claim for disability insurance benefits ("DIB") and supplemental security income benefits ("SSI") under Titles II and XVI, respectively, of the Act. 42 U.S.C. §§ 405(g), 423, 1381a. This matter was referred to a United States Magistrate Judge pursuant to 28 U.S.C. § 636(b) and Local Rule 73.2E(B).

## I.    PROCEDURAL HISTORY

Morris filed applications for DIB and SSI on October 25, 2005, alleging disability since October 15, 2003 because of arthritis and systemic lupus erythematosus. (Tr. 105-08, 122). After her applications were denied, she requested a hearing before an Administrative Law Judge ("ALJ"), which was held on October 19, 2007. (Tr. 28-68). On November 26, 2007, the ALJ issued a decision denying the applications. (Tr. 9-24). Plaintiff submitted new medical evidence to the Appeals Council. (Tr. 234-39). After

the Appeals Council denied review on June 2, 2008 (Tr. 1-4), the ALJ's decision became

the final decision of the Commissioner for purposes of this court's review.

II.     STATEMENT OF ISSUES ON APPEAL

Plaintiff contends that the ALJ made the following errors:

A.      The ALJ erred by giving little weight to the opinion of plaintiff's treating
physician without performing the analysis required by Newton v. Apfel,
209 F.3d 448 (5th Cir. 2000), and Social Security Ruling 96-5p.

B.      The ALJ erred by failing to find that plaintiff's impairment meets or equals
Listing 14.02.  20 CFR, Part 404, Subpart P, Appendix 1.

C.      The ALJ's residual functional capacity assessment was not based on
substantial evidence.

D.      The ALJ erred by failing to evaluate plaintiff's credibility in accordance
with 20 C.F.R. § 404.1529 and Social Security Ruling 96-7p.

III.    ALJ'S FINDINGS RELEVANT TO ISSUES ON APPEAL

The ALJ made the following relevant findings:

1.      Plaintiff has severe impairments consisting of systemic lupus
erythematosus, arthritis and Raynaud's syndrome.  She also has medically
determinable, non-severe mood swings and a vision problem.

2.      Her impairment or combination of impairments do not meet or equal any
listed impairments found at 20 CFR, Part 404, Subpart P, Appendix 1,
including Listing 14.02 for systemic lupus erythematosus.

3.      Although plaintiff's medically determinable impairments could reasonably
be expected to produce the alleged symptoms, her statements concerning
the intensity, persistence and limiting effects of her symptoms are not
entirely credible.

4. Morris has the residual functional capacity to perform sedentary work, except that she cannot be exposed to direct sunlight, intense artificial light, harsh chemicals or extreme heat or cold. She should have the option to alternate between sitting for up to two hours and standing for up to one and one-half hours.

5. She has no past relevant work.

6. Considering plaintiff's age, education, work experience and residual functional capacity, jobs exist in significant numbers in the national economy that she can perform, including telephone solicitor, information clerk and answering service clerk.

(Tr. 14-23).

IV.   ANALYSIS

A.   Standards of Review

The function of this court on judicial review is limited to determining whether there is substantial evidence in the record to support the final decision of the Commissioner as trier of fact and whether the Commissioner applied the appropriate legal standards in evaluating the evidence. Perez v. Barnhart, 415 F.3d 457, 461 (5th Cir. 2005); Waters v. Barnhart, 276 F.3d 716, 716 (5th Cir. 2002); Loza v. Apfel, 219 F.3d 378, 390 (5th Cir. 2000). Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971); Perez, 415 F.3d at 461; Loza, 219 F.3d at 393. This court may not "reweigh the evidence in the record, try the issues de novo or substitute its judgment for the Commissioner's,

even if the evidence weighs against the Commissioner's decision." Newton v. Apfel, 209 F.3d 448, 452 (5th Cir. 2000). The Commissioner, rather than the courts, must resolve conflicts in the evidence. Id.

The ALJ is entitled to make any finding that is supported by substantial evidence, regardless whether other conclusions are also permissible. See Arkansas v. Oklahoma, 503 U.S. 91 (1992). Despite this court's limited function, it must scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether substantial evidence supports it. Perez, 415 F.3d at 461. Any findings of fact by the Commissioner that are supported by substantial evidence are conclusive. Id.; Newton, 209 F.3d at 452; Martinez v. Chater, 64 F.3d 172, 173 (5th Cir. 1995).

To be considered disabled and eligible for SSI or DIB,[1] plaintiff must show that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A). The Commissioner has promulgated regulations that provide procedures for evaluating a claim and determining disability. 20 C.F.R. §§ 404.1501 to 404.1599 & appendices, §§ 416.901 to 416.998 (2007). The regulations include a five-step evaluation process for determining whether an impairment prevents

---

[1]The relevant law and regulations governing a claim for DIB are identical to those governing a claim for SSI. Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994); Hollis v. Bowen, 837 F.2d 1378, 1382 n.3 (5th Cir. 1988).

a person from engaging in any substantial gainful activity. Id. §§ 404.1520, 416.920;

Perez, 415 F.3d at 461; Waters, 276 F.3d at 716; Loza, 219 F.3d at 393.[2] The five-step

inquiry terminates if the Commissioner finds at any step that the claimant is or is not

disabled. Perez, 415 F.3d at 461.

The claimant has the burden of proof under the first four parts of the inquiry. If

she successfully carries this burden, the burden shifts to the Commissioner to show that

other substantial gainful employment is available in the national economy that the

claimant is capable of performing. When the Commissioner shows that the claimant is

capable of engaging in alternative employment, the burden of proof shifts back to the

claimant to rebut this finding. Id.; Newton, 209 F.3d at 453.

_____

[2]The five-step analysis requires consideration of the following:

First, if the claimant is currently engaged in substantial gainful employment, he or she is found not disabled. 20 C.F.R. §§ 404.1520(b), 416.920(b).

Second, if it is determined that, although the claimant is not engaged in substantial employment, he or she has no severe mental or physical impairment which would limit the ability to perform basic work-related functions, the claimant is found not disabled. Id. §§ 404.1520(c), 416.920(c).

Third, if an individual's impairment has lasted or can be expected to last for a continuous period of twelve months and is either included in a list of serious impairments in the regulations or is medically equivalent to a listed impairment, he or she is considered disabled without consideration of vocational evidence. Id. §§ 404.1520(d), 416.920(d).

Fourth, if a determination of disabled or not disabled cannot be made by these steps and the claimant has a severe impairment, the claimant's residual functional capacity and its effect on the claimant's past relevant work are evaluated. If the impairment does not prohibit the claimant from returning to his or her former employment, the claimant is not disabled. Id. §§ 404.1520(e), 416.920(e).

Fifth, if it is determined that the claimant cannot return to his or her former employment, then the claimant's age, education, and work experience are considered to see whether he or she can meet the physical and mental demands of a significant number of jobs in the national economy. If the claimant cannot meet the demands, he or she will be found disabled. Id. §§ 404.1520(f)(1), 416.920(f)(1). To assist the Commissioner at this stage, the regulations provide certain tables that reflect major functional and vocational patterns. When the findings made with respect to a claimant's vocational factors and residual functional capacity coincide, the rules direct a determination of disabled or not disabled. Id. § 404, Subpt. P, App. 2, §§ 200.00-204.00, 416.969 ("Medical-Vocational Guidelines").

The court "weigh[s] four elements of proof when determining whether there is substantial evidence of disability: (1) objective medical facts; (2) diagnoses and opinions of treating and examining physicians; (3) the claimant's subjective evidence of pain and disability; and (4) [her] age, education, and work history." Martinez, 64 F.3d at 174.

B.    Factual Background

Plaintiff testified that she is 35 years old, is four feet eleven inches tall and weighs 132 pounds. (Tr. 35). She stated that she is divorced and has no children. She testified that her driver's license was suspended in 1999 when she helped her husband escape from incarceration. (Tr. 36). She stated that she was imprisoned for 90 days and never got a driver's license after that. She said that her current boyfriend drove her to the administrative hearing, and that her boyfriend's nephew drives her to doctor's appointments. (Tr. 37).

Morris testified that she completed the eleventh grade, does not have a GED, never had any vocational training and never served in the military. (Tr. 37-38). She stated that she last worked as a housekeeper at a hotel in Arkansas for about six months in 2003. She said she stopped working because her symptoms were worsening and she was getting sick. (Tr. 38). She testified that she went back to work at the same place for a few days around Christmas in 2004 because they desperately needed her. She stated that, prior to the housekeeping job, she worked in a daycare center in Louisiana for eleven months, taking care of toddlers. She testified that she worked at various jobs before that,

including at a Domino's fast food restaurant and as a cashier at a K-mart in Louisiana. (Tr. 39-40, 62).

Plaintiff said she had not sought any full-time work since 2003 because she did not need to work at that time. She stated that her symptoms were getting worse when she was working and that she went to work even when she was swollen, sick and feverish, but doing so made her sicker so that she had to quit. (Tr. 40-41). She said she has no income and does not receive food stamps, but her boyfriend is employed by an apartment complex.

Morris testified that she was diagnosed with lupus[3] in 2005, after a nurse friend told her she looked like she had it. Plaintiff stated that she only saw Dr. Harris once, and that he referred her to Dr. Heather North. (Tr. 41-42). She said she first saw Dr. North on August 5, 2005 and had some tests done. (Tr. 42).

Plaintiff said that, since her first visit to Dr. North, she has arthritis in her fingers, knees and ankles, and that the bottoms of her feet swell. She stated that she gets fevers and has blotchy skin on her face and arms, which is further irritated if she goes out in the

---

[3]Systemic lupus erythematosus is "an inflammatory connective tissue disease of unknown cause that occurs chiefly in women and that is characterized especially by fever, skin rash, and arthritis, often by acute hemolytic anemia, by small hemorrhages in the skin and mucous membranes, by inflammation of the pericardium, and in serious cases by involvement of the kidneys and central nervous system." Medline Plus Medical Dictionary, avail. at http://www2.merriam-webster.com/cgi-bin/mwmednlm?book =Medical&va=systemic%20lupus%20erythematosus.

sun or is under fluorescent lights.  She said she has fatigue as well.  She testified that her fingers, knees, ankles and feet are painful when they swell.  (Tr. 43).

Morris stated that Dr. North, her treating physician, is aware of her financial situation and sees her about every four months, so that she can save enough money to pay for the next visit.  She said she last saw Dr. North on October 3, 2007.  She testified that she has never been hospitalized overnight since her disability onset date in 2003.  She said her doctor has not discussed future treatment with her, other than continuing her medication.  (Tr. 44).  She said she takes prednisone[4] and Plaquenil[5] and uses Westcort[6] cream for the rashes.  She testified that the medications help somewhat.

Plaintiff testified that she has vision problems, which Dr. North has told her are caused by both her lupus and the Plaquenil.  She said that Dr. North has advised her to see an eye doctor, but that she and her boyfriend cannot afford to pay for it.  (Tr. 45).

---

[4]Prednisone, a steroid, "is used to reduce inflammation and alleviate symptoms in a variety of disorders, including . . . [d]iseases of the connective tissue including systemic lupus erythematosus[; and] . . . [f]luid retention due to 'nephrotic syndrome' (a condition in which damage to the kidneys causes protein to be lost in the urine) . . . ." PDRhealth, avail. at http://www.pdrhealth.com/drugs/rx/rx-mono. aspx?contentFileName=Pre1121.html&contentName=Prednisone&contentId=454.

[5]Plaquenil (generic name:  hydroxychloroquine sulfate) "is prescribed for the prevention and treatment of certain forms of malaria. Plaquenil is also used to treat the symptoms of rheumatoid arthritis such as swelling, inflammation, stiffness, and joint pain. It is also prescribed for lupus erythematosus, a chronic inflammation of the connective tissue." Id. at http://www.pdrhealth.com/drugs/ rx/rx-mono.aspx?contentFileName=Pla1337.html&contentName=Plaquenil&contentId=442.

[6]Westcort is a brand name for hydrocortisone, a corticosteroid, which is used to treat skin irritation, allergic reactions, and other types of skin problems. Id. at http://www.pdrhealth.com/drugs/ otc/otc-mono.aspx?contentFileName=DNX0417.xml&contentName=HYDROCORTISONE+MAXI MUM+STRENGTH&contentId=2599.

Morris stated that she usually gets up at 8:30 a.m. and goes to bed at 10:30 at night. She said she makes meals for herself and her boyfriend and that she does household chores one room at a time. She testified that she gets hot and perspires when she is cleaning house, which makes her rash "act up." She said she has to take a break and rest for a little while before she can continue. She stated that she can do laundry if she just takes her time to do it. (Tr. 46). She said she can bathe and dress herself.

Plaintiff testified that her normal routine is to get up, have coffee and start cleaning the house. She stated that she takes her time and it usually takes her all day, but she can do it. She said she does not watch television, but plays computer games, reads books and puts puzzles together. (Tr. 47). She said she never does any yard work because the sun strongly affects her. (Tr. 47-48). She testified that she visits friends and family occasionally in the evenings. She said she does not smoke or drink alcohol.

Morris stated that she can walk for one block and stand for one and one-half hours before she has to sit and rest. (Tr. 48). She said she can sit at her computer for about two hours before she has to get up and stretch. She testified that she can comfortably pick up five or six pounds and carry it for five or six feet, but that her hands would drop any more weight than that. She said she can climb a flight of stairs but has to rest between floors if walking up and down more than one flight. She testified that she can pick up pens, pencils and rubber bands from a table. (Tr. 49). She said her grip strength is good and she has feeling in her fingertips.

Plaintiff testified that she has trouble sleeping because of indigestion and heartburn, or when she is nervous from thinking about what is happening to her. She said that, if she thinks about it, she gets depressed and stays awake for hours watching television. (Tr. 50).

Morris stated that she could not perform a sedentary job because her fingers would swell, she would have trouble picking up a phone and she would be afraid that she might drop it. She said that the swelling only happens when her rash "acts up," such as when she is nervous, worries too much or goes out in the sun. (Tr. 51).

Plaintiff testified that she cannot see objects that are far away. At the hearing, she was able to read a clock on the wall that was six or eight feet away. (Tr. 52). She said she would be afraid to drive, even if she had a driver's license, because she might have a reaction to her medications and her vision might get blurry. (Tr. 52-53). She stated that sometimes her vision blurs and she sees spots. She said that she could stand for only one and one-half hours total in an eight-hour day.

Morris said that Dr. North recently referred her to a mental health center, but she has not gone because she cannot afford it. She stated that Dr. North referred her because she has a lot of mood swings. (Tr. 53). She said that one minute she is happy, and the next minute something can upset her. She stated that she is easily upset.

Plaintiff testified that she uses a laptop computer to play games, which require the use of a keyboard and a mouse. She said she can play for about an hour before her hands

begin to swell and hurt. (Tr. 54). She stated that she only uses Westcort cream when she goes outside and that she puts sunscreen on top of the Westcort.

Morris said she has to rest for about four hours during the day. She said that, when she worked as a housekeeper, she thought she was having an allergic reaction to the cleaning products, so she wore gloves. However, she said that she still had the problems despite using gloves and that chemicals can irritate her skin. (Tr. 55-56).

Plaintiff testified that she can suddenly have a fever if she works too much or gets overheated. She said she was rushed to the emergency room the last time she had a fever, when her temperature was 102.9 degrees. (Tr. 56). She stated that the hospital gave her liquid Motrin and her fever went away in a couple of hours. She testified that the incident happened when she was living in Arkansas in 2003. (Tr. 57-58).

Morris said her blood pressure was high at her last visit to Dr. North because her grandmother had recently died and she was upset. She stated that her blood pressure had never been that high before. (Tr. 57). She said that she went to the hospital emergency room in Biloxi once in 2006 for dehydration because she had nausea and diarrhea, but that she had not gone to the hospital any other time since 2003. (Tr. 58).

Plaintiff said she has not had her eyes examined in the last five years because she cannot afford it. She said Dr. North told her that her lupus and her medication could cause mood swings, but that she had not noticed them before January 2007. (Tr. 59-60). She stated that the mood change "just sneaks up" and she goes from being happy to being

upset by something. She testified that she uses the artificial tears that Dr. North prescribed and that the drops help clear out the redness in her eyes. (Tr. 60).

### C. Vocational Expert Testimony

A vocational expert, Charles Miller, testified at the hearing. He stated that plaintiff's past work as a daycare worker was semi-skilled, light work, while her past work as a hotel housekeeper, as a cashier at a K-mart and at a Domino's restaurant were all unskilled, light jobs. (Tr. 61-62).

The ALJ posed a hypothetical of a 31-year old claimant with an eleventh-grade education with plaintiff's past work experience, who can perform the full range of light work, with the following limitations: she can sit, stand or walk, with normal breaks, for six hours in an eight-hour day, but could not be exposed to direct sunlight, intensive artificial light, harsh chemicals, or extreme heat or cold. (Tr. 62-63). Miller testified that such a claimant could not perform any of Morris's past jobs, but could perform jobs that are available in the state and national economies within the restricted range of light work, such as sorter/wrapper, vending machine attendant and companion. He opined that she could also perform available sedentary jobs, such as telephone solicitor, information clerk and answering service clerk. (Tr. 63-64).

The ALJ modified the hypothetical so that the claimant could perform a full range of sedentary work for eight hours, provided that she had the option to alternate sitting for up to two hours and standing for up to one and one-half hours at a time, and that she was

not exposed to direct sunlight, intensive artificial light, harsh chemicals, or extreme heat or cold.  The vocational expert stated that she could perform the previously identified sedentary jobs.  (Tr. 64-65).  He testified that she could not perform any job if she were limited to a maximum of three and one-half hours of work.

Upon cross-examination by plaintiff's attorney, Miller testified that a person would still be able to perform the three sedentary jobs if she could stand for a total of only one and one-half hours per day, but could sit for the rest of the day.  (Tr. 65-66).  Plaintiff's attorney then attempted to ask the vocational expert if a person who was unable to work eight hours per day, five days per week, on a sustained basis could perform any work.  The ALJ stated that such a scenario was less than sedentary as a matter of law.  Miller agreed.  (Tr. 66).  The ALJ then stated that the vocational expert did not have to answer that question.  Miller testified that the hypothetical person would not be able to perform any job if she had to lie down for four hours per day.  (Tr. 67).

D.     Medical Evidence

I have reviewed the medical records in evidence and the ALJ's summary of the medical evidence. (Tr. 15-16, 19-22). I find the ALJ's summary of the medical evidence substantially correct and incorporate it herein by reference, with the modifications, corrections and highlights noted below.

E.    Plaintiff's Appeal

       1.    The ALJ did not err by according little weight to the opinion of
             plaintiff's treating physician.

Plaintiff's treating physician, rheumatologist Heather H. North, M.D., saw her

every three to four months from August 5, 2005 through January 23, 2007; on October 3,

2007; and on March 5, 2008.[7]  No other physician examined Morris.  She argues that the

ALJ should have given at least deference, if not controlling weight, to Dr. North's

opinions.  Furthermore, citing Newton, 209 F.3d at 455-57, and Social Security Ruling

96-5p, plaintiff contends that the ALJ should have expressly considered the six factors

listed in 20 C.F.R. § 404.1527[8] before rejecting Dr. North's opinions.

On June 20, 2006, Dr. North completed a form, apparently prepared by plaintiff's

attorney, on which she checked "yes" to statements that Morris "exhibits the following

symptoms/signs associated with Systemic Lupus Erythematosus:" "involvement" of the

joint, ocular, digestive, renal, hematologic and skin systems.  Dr. North also checked

"yes" to the statement that plaintiff "exhibits significant, documented, constitutional

symptoms and signs of severe fatigue, fever, malaise, and weight loss associated with the

---

[7]Morris submitted the October 2007 and March 2008 medical records to the Appeals Council
after the ALJ rendered his opinion on November 26, 2007.  However, the Appeals Council found that
the additional records provided no basis to alter the ALJ's decision.

[8]These factors are (1) the length of the treatment relationship and frequency of examination,
(2) the nature and extent of the treatment relationship, (3) the relevant evidence supporting the opinion,
(4) the consistency of the treating physician's opinion with the record as a whole, (5) whether the opinion
is that of a specialist, and (6) "other factors which tend to support or contradict the opinion."  20 C.F.R.
§ 404.1527(d)(2).

above." The language of these statements tracks the language of Listing 14.02. Finally, Dr. North checked "yes" that Morris was unable to work for eight hours per day, five days per week, "on a sustained basis due to pain/fatigue/other symptoms" and that her "[s]ymptoms/signs have/expected to last at least 1 year." Dr. North added a handwritten comment that Morris "is developing increased proteinuria,[9] a sign that her renal lupus is escalating," and that "we have consulted with nephrology." (Tr. 193).

Dr. North completed another form on May 6, 2008, in which she said that she had reviewed her June 20, 2006 report and that plaintiff's condition remains the same. Dr. North checked "yes" in response to statements that: Morris suffers from systemic lupus erythematosus and chronic fatigue; is unable to work for eight hours per day, five days per week, on a sustained basis due to pain, fatigue or other symptoms; and her limitations have existed for at least one year before June 21, 2006 and are likely to continue into the foreseeable future. In handwritten remarks, Dr. North stated that plaintiff's lupus was manifested by arthralgias,[10] skin rashes, proteinuria, positive results on certain blood tests and chronic fatigue. (Tr. 236).

The ALJ found that the record does not support Dr. North's stated opinion that Morris "exhibits significant, documented, constitutional symptoms and signs of severe

---

[9] Proteinuria is "the presence of excess protein in the urine." Medline Plus Medical Dictionary, avail. at http://www2.merriam-webster.com/cgi-bin/mwmednlm?book=Medical&va=proteinuria.

[10] Arthralgia is "pain in one or more joints." Medline Plus Medical Dictionary, avail. at http://www2.merriam-webster.com/cgi-bin/mwmednlm?book=Medical&va=arthralgia.

fatigue, fever, malaise, and weight loss associated with" her lupus. (Tr. 16). The ALJ "accorded little weight" to Dr. North's opinion that Morris cannot work for eight hours per day, five days per week, on a sustained basis because that "is an issue reserved to the Commissioner." (Tr. 22). To support his conclusions, the ALJ cited plaintiff's symptoms, her medication and treatment regime, and a residual functional capacity assessment completed on January 3, 2006 by a medical consultant, Robert Culpepper, M.D., who did not examine her, but reviewed her medical records. (Tr. 195-202).

Plaintiff's argument in this regard fails for several reasons. First, Dr. North's opinion that Morris is unable to work is <u>not</u> a medical opinion entitled to any weight. A physician's statement that a patient is disabled does not mean that the patient is disabled for purposes of the Act because that is a legal determination that may be made only by the Commissioner. <u>Thibodeaux v. Astrue</u>, No. 08-30989, 2009 WL 1344809, at *4 (5th Cir. May 14, 2009) (citing <u>Frank v. Barnhart</u>, 326 F.3d 618, 620 (5th Cir. 2003)); <u>Chambliss v. Massanari</u>, 269 F.3d 520, 522 (5th Cir. 2001).

> [S]ome opinions by physicians are not medical opinions, and as such have no "special significance" in the ALJ's determination. Among the opinions by treating doctors that have no special significance are determinations that an applicant is "disabled" or "unable to work." These determinations are legal conclusions that the regulation describes as "reserved to the Commissioner." . . . The doctor's opinion [that plaintiff could not work] was not a medical opinion within the meaning of the regulation.

<u>Frank</u>, 326 F.3d at 620 (quoting 20 C.F.R. § 404.1527(e), (1) & (e)(3)); <u>accord</u> Social Security Ruling 96-5p, 1996 WL 374183, at *2.

Second, plaintiff's argument that the ALJ must expressly consider the six factors in 20 C.F.R. § 404.1527 whenever the ALJ rejects a treating physician's opinion sweeps too broadly.  Generally,

> [t]he opinion of the treating physician who is familiar with the claimant's impairments, treatments and responses, should be accorded great weight in determining disability.  A treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence.  The opinion of a specialist generally is accorded greater weight than that of a non-specialist.
> . . . .  The treating physician's opinions are not conclusive.  The opinions may be assigned little or no weight when good cause is shown.  Good cause may permit an ALJ to discount the weight of a treating physician relative to other experts where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence.

Newton, 209 F.3d at 455-56 (quotations and citations omitted).  The Fifth Circuit "conclude[d] that, absent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist, an ALJ may reject the opinion of the treating physician only if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in 20 C.F.R. § 404.1527(d)(2)."  Id. at 453; see also Thibodeaux, 2009 WL 1344809, at *4 (when the record contains "reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist, . . . the ALJ was not required to apply the criteria set forth in 20 C.F.R. § 404.1527(d)(2).") (emphasis added).

Contrary to plaintiff's argument, the ALJ did not completely reject or ignore Dr. North's opinions. The ALJ reviewed the medical records and accepted Dr. North's diagnoses and her opinions concerning plaintiff's symptoms to the extent that they were supported by the treatment records. Thus, the ALJ found that Morris's systemic lupus erythematosus, arthritis and Raynaud's syndrome[11] are severe impairments, and that she has medically determinable mood swings and a vision problem.

However, the ALJ's finding that the conclusory statements in Dr. North's June 20, 2006 report should be given little weight because they were not consistent with her treatment records is supported by substantial evidence. Although Dr. North checked off the "involvement" of several of plaintiff's systems, her report did not state the effects or functional limitations, if any, associated with the involvement of any system. The ALJ also noted that the record did not support Dr. North's statement, which was unsupported by any specific clinical findings in the report, that plaintiff had "significant, documented, constitutional symptoms and signs of severe fatigue, fever, malaise, and weight loss." "Severe fatigue" and malaise are "[c]onstitutional symptoms or signs" defined by the Commissioner's regulations, as follows: "Severe fatigue means a frequent sense of exhaustion that results in significantly reduced physical activity or mental function.

---

[11]Raynaud's disease is a vascular disorder "marked by recurrent spasm of the capillaries and especially those of the fingers and toes upon exposure to cold." It "is characterized by pallor, cyanosis, and redness in succession usually accompanied by pain, and . . . in severe cases progresses to local gangrene." Medline Plus Medical Dictionary, at http://www2.merriam-webster.com/cgi-bin/mwmednlm.

Malaise means frequent feelings of illness, bodily discomfort, or lack of well-being that result in significantly reduced physical activity or mental function." 20 C.F.R. § 14.00(C)(2) (2008).[12]

The ALJ accurately stated that Dr. North's records reveal that plaintiff's primary symptoms were rash, dryness and proteinuria; that she had no active joint synovitis;[13] and that her lupus was stable on January 23, 2007. (Tr. 21). The medial evidence also reveals that Morris's symptoms did not change significantly during the next 14 months.

Dr. North noted at least twice that plaintiff's primary symptom was a rash that was "quite impressive" and persistent, but only slightly tender. Although it flared up intermittently, plaintiff's rash improved after she began a regular medication regime.

On September 19, 2006 and January 23, 2007, Dr. North noted that plaintiff's lupus was stable without any active synovitis in any joint. (Tr. 209, 210, 211, 212, 223, 229, 230). On January 23, 2007, Dr. North wrote a referral note to a mental health center in which she stated that Morris had "controlled" systemic lupus erythematosus, but needed evaluation and treatment for significant mood swings and possible bipolar

---

[12]These terms were not defined by the regulations in effect at the time that the ALJ rendered his opinion, but they were defined as quoted above before the Appeals Council completed its review.

[13]Synovitis is "inflammation of a synovial membrane[,] usually with pain and swelling of the joint." Medline Plus Medical Dictionary, avail. at http://www2.merriam-webster.com/cgi-bin/ mwmednlm?book=Medical&va=synovitis. A synovial membrane is "the dense connective-tissue membrane that secretes synovial fluid and that lines the ligamentous surfaces of joint capsules, tendon sheaths where free movement is necessary, and bursae." Id. at http://www2.merriam-webster.com/cgi-bin/mwmednlm.

disorder. (Tr. 233). Although Morris often reported fatigue (Tr. 208, 209, 230, 231), nothing in her treatment records indicates that it was so severe that she needed to lie down for four hours during the day or that her activities of daily living were severely limited by her fatigue. After plaintiff's initial visit on August 5, 2005, when she reported "fevers and sweats at times" (Tr. 212), Dr. North never noted any occurrence of fever. Morris testified that the last time she had a high fever was in 2003 and that it was alleviated by liquid Motrin in a few hours.

Dr. North observed on September 19, 2006 that an ultrasound of plaintiff's kidneys was normal. (Tr. 230). This was three months after Dr. North's June 20, 2006 statement that plaintiff's increased proteinuria was a sign that her renal lupus was escalating.

On October 3, 2007, plaintiff told Dr. North that she was "doing fair" with no new symptoms. She had no synovitis on physical examination. (Tr. 231).

At a March 5, 2008 visit, Morris had run out of prednisone, but her blood pressure was decreased, possibly secondary to discontinuing the steroid. Morris reported some increase in arthralgias, which she was managing with Plaquenil.[14] Dr. North noted some tenderness in plaintiff's hands, wrists, elbows, knees and ankles and observed that Morris

---

[14]Dr. North's handwritten notes are difficult to read, but she appears to state that plaintiff was using "HCQ" to manage her arthralgias. Dr. North often used the abbreviation HCQ, which refers to hydroxychloroquine, the generic name for Plaquenil. MediLexicon, avail. at http://www.medilexicon. com/medicalabbreviations.php.

had synovitis in her hands, but not in any other joints. Dr. North continued plaintiff's prescription for Plaquenil, but advised her to stay off of prednisone unless her symptoms increased. (Tr. 239).

Two months later, on May 6, 2008, Dr. North filled out the second checklist form, stating that plaintiff's condition remained the same as it was when she completed her June 20, 2006 report. Again, the physician did not provide any findings concerning the frequency, severity or functional limitations of the symptoms that she described.

As to weight loss, plaintiff points out that Dr. North's notes document a total loss of seventeen pounds over the entire treatment period from August 5, 2005 through March 5, 2008. However, she does not note that sixteen of those seventeen pounds were lost during the first six months. Plaintiff testified that she is four feet eleven inches tall. On August 5, 2005, she weighed 140 pounds. On June 13, 2006, just before Dr. North completed the June 20, 2006 report stating that Morris had exhibited weight loss, she hit her lowest recorded weight of 119 1/2 pounds. However, she gained weight over the next three visits. Between February 22, 2006 and January 23, 2007, her weight remained around 120 to 124 pounds. She gained nine pounds during the next nine months, then lost ten pounds by March 5, 2008 to return to 123 pounds. Thus, her weight remained around 120 to 124 pounds during five of her eight visits.

Because Dr. North's conclusory opinions on her June 20, 2006 and May 6, 2008 checklist forms are not supported by her treatment records, the ALJ was not required to

consider expressly the six factors of 20 C.F.R. § 404.1527(d)(2). Furthermore, the ALJ

did not ignore those opinions, but explained his reasons for according them little weight.

Therefore, this assignment of error lacks merit.

> 2. The ALJ did not err by failing to find that plaintiff's impairment meets or equals Listing 14.02.

Morris argues that the ALJ erred by failing to discuss the paragraph B criteria of

Listing 14.02 for systemic lupus erythematosus and therefore failing to find that her

impairment meets or equals the listing. Listing 14.02 (as it was in effect from June 19,

2007 through December 17, 2007) provided two options by which the listing could be

met, either under paragraph A or paragraph B.

> 14.02 Systemic lupus erythematosus. Documented as described in 14.00B1,[15] with:
> A. One of the following:
> 1. Joint involvement, as described under the criteria in 1.00; or
> 2. Muscle involvement, as described under the criteria in 14.05; or
> 3. Ocular involvement, as described under the criteria in 2.00ff; or
> 4. Respiratory involvement, as described under the criteria in 3.00ff; or
> 5. Cardiovascular involvement, as described under the criteria in 4.00ff or 14.04D; or
> 6. Digestive involvement, as described under the criteria in 5.00ff; or
> 7. Renal involvement, as described under the criteria in 6.00ff; or
> 8. Hematologic involvement, as described under the criteria in 7.00ff; or
> 9. Skin involvement, as described under the criteria in 8.00ff; or
> 10. Neurological involvement, as described under the criteria in 11.00ff; or

---

[15]Section 14.00(B)(1) describes the disease as "characterized clinically by constitutional symptoms and signs (e.g., fever, fatigability, malaise, weight loss), multisystem involvement and, frequently, anemia, leukopenia, or thrombocytopenia." 20 C.F.R. Part 404, Subpart P, App. 1, § 14.00(B)(1).

11.  Mental involvement, as described under the criteria in 12.00ff.
<u>Or</u>
B.  Lesser involvement of two or more organs/body systems listed in paragraph A, with <u>significant</u>, documented, constitutional symptoms and signs of <u>severe </u>fatigue, fever, malaise, <u>and </u>weight loss.  <u>At least one of the organs/body systems must be involved to at least a moderate level of severity</u>.

20 C.F.R. Part 404, Subpart P, App. 1, § 14.02 (emphasis added).

The ALJ found that Dr. North's June 26, 2006 opinion "posited" involvement of the joint, ocular, digestive, renal, hematologic and skin systems, but his "review of the record fail[ed] to establish the criteria of any listed impairment concerning the affected body systems."  (Tr. 15).  He also found that plaintiff's fatigue, fevers and sweats at times "are not the 'significant, documented, constitutional symptoms and signs of severe fatigue, fever, malaise, and weight loss' set forth in the listing."  (Tr. 16).  Morris contends that the ALJ failed to discuss the paragraph B criteria, that he focused only on Dr. North's initial examination and that he erroneously rejected Dr. North's June 20, 2006 opinions.

The ALJ accepted Dr. North's opinions that plaintiff's systemic lupus erythematosus involved the listed systems.  However, as explained in the preceding section of this report and recommendation, Dr. North's June 20, 2006 form did not reveal the severity or functional impact of the listed system involvements.  Furthermore, as previously discussed, Dr. North's treatment records do not support the severe, documented, constitutional symptoms that Dr. North checked off on the form.  Thus, it

was not error for the ALJ to reject the conclusory statements in Dr. North's June 20, 2006 opinion that were not supported by Dr. North's own treatment records. Without "significant, documented, constitutional symptoms and signs of severe fatigue, fever, malaise, and weight loss," plaintiff cannot meet the paragraph B criteria of the listing.

Thus, the ALJ's finding that Morris did not meet Listing 14.02 is supported by substantial evidence.

### 3. The ALJ's residual functional capacity assessment was based on substantial evidence.

Plaintiff argues that the ALJ's residual functional capacity assessment was not based on substantial evidence because he failed to include in his assessment or his hypothetical to the vocational expert any limitation for her severe fatigue. She contends that severe fatigue is a typical symptom of lupus, as noted in Listing 14.02; that Dr. North's June 20, 2006 opinion lists severe fatigue as one of her constitutional symptoms; that her fatigue is noted multiple times in the treatment records; that she testified that she must rest for four hours during the day; and that the vocational expert testified that she would not be able to maintain employment if she had to lie down for four hours per day.

However, as discussed in the preceding sections of this report and recommendation, Dr. North's treatment records and her June 20, 2006 checklist do not document the severity of plaintiff's fatigue and therefore are not substantial evidence to support a limitation based on severe fatigue. An ALJ's hypothetical question is defective

and will not be allowed to stand unless it reasonably incorporated all of the disabilities recognized by the ALJ, "and the claimant or his representative is afforded the opportunity to correct deficiencies in the ALJ's question by mentioning or suggesting to the vocational expert any purported defects in the hypothetical questions (including additional disabilities not recognized by the ALJ's findings and disabilities recognized but omitted from the question)." Bowling v. Shalala, 36 F.3d 431, 436 (5th Cir. 1994).

In this case, plaintiff's counsel questioned the vocational expert and asked him about the effects of plaintiff's alleged additional limitation of severe fatigue. However, the ALJ found that the record did not support such a requirement. Because substantial evidence supports the ALJ's finding that plaintiff does not suffer from severe fatigue, the ALJ was not required to include such a limitation in his hypothetical. Carey v. Apfel, 230 F.3d 131, 143 (5th Cir. 2000). The vocational expert's testimony is substantial evidence on which the ALJ can rely to determine that plaintiff can perform sedentary work with the restrictions noted in the ALJ's opinion.

Moreover, as discussed in the next section, substantial evidence supports the ALJ's determination that Morris's account of her symptoms was not credible.

Therefore, this assignment of error lacks merit.

4. The ALJ did not err by failing to evaluate plaintiff's credibility in accordance with 20 C.F.R. § 404.1529 and Social Security Ruling 96-7p.

Morris argues finally that the ALJ erred by failing to evaluate her credibility in accordance with 20 C.F.R. § 404.1529 and Social Security Ruling 96-7p, and particularly that the ALJ failed to make any specific findings about her testimony concerning her fatigue and her need to rest for four hours during the day. She contends that the ALJ stated only that her "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible," (Tr. 19), and that this single, conclusory statement does not satisfy Social Security Ruling 96-7p, which requires "specific reasons for the finding on credibility, supported by the evidence in the case record." Social Security Ruling 96-7p, 1996 WL 374186, at *4 (July 2, 1996).

Regarding the effect of 20 C.F.R. § 404.1529 and Social Security Ruling 96-7p on an ALJ's credibility findings, the Fifth Circuit has held that the ALJ is bound to explain his reasons for rejecting a claimant's subjective complaints, but "he is not required to 'follow formalistic rules in his articulation.'" Hernandez v. Astrue, 278 Fed. Appx. 333, 2008 WL 2037273, at *5 (5th Cir. 2008) (quoting Falco v. Shalala, 27 F.3d 160, 164 (5th Cir. 1994)).

The ALJ has the responsibility to evaluate the credibility of witnesses, Masterson v. Barnhart, 309 F.3d 267, 272 (5th Cir. 2002), and his evaluation is entitled to considerable deference by this court. Bedford v. Astrue, 236 Fed. Appx. 957, 2007 WL

1733132, at *4 (5th Cir. 2007) (citing <u>Newton</u>, 209 F.3d at 459; <u>Falco</u>, 27 F.3d at 164 & n.18). The ALJ's explanation of his reasons for finding plaintiff not entirely credible is all that is required. <u>Id.</u> at 163-64; <u>Godbolt v. Apfel</u>, No. 98-1680, 1999 WL 179476, at *9 (E.D. La. Mar. 31, 1999) (Vance, J.); <u>accord</u> <u>James J. Flanagan Stevedores, Inc. v. Gallagher</u>, 219 F.3d 426, 430 & n.8 (5th Cir. 2000) (citing <u>Falco</u>, 27 F.3d at 164).

Here, the ALJ explained that plaintiff's primary symptoms, as recorded by Dr. North, were rash, dryness and proteinuria, with no active joint synovitis, and that Dr. North opined that plaintiff's symptoms were stable by January 23, 2007. The ALJ discounted Morris's testimony that she suffers significant joint pain because, as he accurately stated, the records reflect that she only took ibuprofen occasionally for pain. Once she started on medication, the records do not contain significant complaints of joint pain. At her March 5, 2008 visit, Morris reported that she had run out of prednisone and that she had some increase in arthralgias, which she was managing with Plaquenil. Dr. North did not prescribe any additional medication.

The ALJ further found that the limitations on plaintiff's activities of daily living to which she testified appeared to be self-imposed, as Dr. North never requested that she restrict her activities, other than to avoid sun exposure. The ALJ explained that Morris was able to cook, do household chores, take care of her personal needs, play computer games, read, put puzzles together and visit with friends and family, which he found were

consistent with an ability to perform sedentary work. Again, as previously explained, the ALJ properly accorded little weight to Dr. North's opinion that Morris cannot work.

"Accordingly, the Commissioner applied the correct legal standard and substantial evidence supports his finding regarding [plaintiff's] credibility." Hernandez, 2008 WL 2037273, at *5. This assignment of error is meritless.

## CONCLUSION

The ALJ did not err by giving little weight to the opinion of plaintiff's treating physician, by failing to find that plaintiff's impairment meets or equals Listing 14.02 or by improperly evaluating her credibility. Furthermore, the ALJ's residual functional capacity assessment was based on substantial evidence.

## **RECOMMENDATION**

For the foregoing reasons, IT IS RECOMMENDED that plaintiff's complaint be DISMISSED WITH PREJUDICE.

A party's failure to file written objections to the proposed findings, conclusions, and recommendations in a magistrate judge's report and recommendation within ten (10) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with

notice that such consequences will result from a failure to object.  <u>Douglass v. United</u>

<u>Servs. Auto. Ass'n</u>, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).

New Orleans, Louisiana, this ____29th____ day of June, 2009.


JOSEPH C. WILKINSON, JR.
UNITED STATES MAGISTRATE JUDGE